# In the United States Court of Federal Claims

No. 20-1285
(Filed: July 15, 2025)

```
****************************************
HAMILTON SQUARE, LLC,              *
                                   *
              Plaintiff,           *
                                   *
       v.                          *
                                   *
THE UNITED STATES,                 *
                                   *
              Defendant.           *
****************************************
```

*Joanne Leah Castella,* Burke, Williams & Sorensen, LLP, Oakland, CA, counsel for Plaintiff.

*Brittney M. Welch,* U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Elizabeth R. McGurk-Fox*, Office of General Counsel, Naval Litigation Office, of counsel.

## OPINION AND ORDER

**DIETZ, Judge.**

Hamilton Square, LLC ("Hamilton") sued the United States for breach of contract and breach of the implied duty of good faith and fair dealing in connection with Hamilton's 2005 purchase from the United States Department of the Navy ("Navy") of a plot of land formerly used as a Naval Exchange gas and public works station. Hamilton alleges that the Navy breached its contractual obligations by failing to remediate the land after Hamilton notified the Navy of newly discovered contamination in 2019. Ruling on the government's motion to dismiss the complaint, the Court previously dismissed several of Hamilton's claims but found that Hamilton sufficiently stated claims for breach of contract based on the Navy's alleged failure to remediate newly discovered chloroform and petroleum contamination and for breach of the implied duty of good faith and fair dealing.

Before the Court is the government's motion for summary judgment on Hamilton's outstanding claims filed pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Hamilton opposes the motion. For the reasons set forth below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion.

## I.  FACTUAL BACKGROUND[1]

The dispute concerns 2.7 acres of land (the "Property") in Novato, California, located approximately 20 miles north of San Francisco. [ECF 66] at 8.[2] The Property was part of a 310-acre Department of Defense facility. *Id.* From the mid-1970's through the early 1990's, the Navy used the Property "as a Naval Exchange gas station and housed several underground gasoline storage tanks." *Id.* In 1998, after the facility was closed under the Defense Base Closure and Realignment Act of 1993, the Navy and the Novato Public Finance Authority ("NPFA") entered into a purchase agreement to transfer the 310 acres, including the Property, to the NPFA. *Id.*

Due to leaks in the underground storage tanks, the Property had known petroleum contamination in the soil and ground water. [ECF 66] at 8-9. Prior to the sale, the Navy undertook efforts to remediate the Property for commercial use. *Id.* at 9. The remediation efforts, which were overseen by the California Department of Toxic Substances Control ("DTSC") and the San Francisco Regional Water Quality Control Board ("RWQCB"), included the removal of the storage tanks and surrounding impacted soils. *Id.* Residual petroleum contamination under the gas station building was left in place. *Id.* The Navy also sampled the soil for contaminants, such as gasoline constituents and chloroform. *Id.* The sampling data did not indicate any chloroform contamination. *Id.*

In August 2003, the Navy released a Finding of Suitability to Transfer (the "FOST"). [ECF 66-2] at 66. The Navy amended the FOST in September 2003. [ECF 66] at 10. The stated purpose of the FOST was "to determine whether [the Property was] environmentally suitable for transfer by deed under Section 120(h) of the Comprehensive Environmental Response, Contamination, and Liability Act (CERCLA) in a manner protective of human health and the environment." [ECF 66-2] at 71. The FOST stated that the Property "will be sold for future commercial use or as otherwise zoned by the City of Novato." *Id.* It also identified "Lead" as the only CERCLA hazardous substance stored, disposed of, or released at the Property between 1974 and 1992. *Id.* at 103. Additionally, it indicated that "[t]he only outstanding environmental issues at the Property are petroleum contamination in groundwater and residual contamination in soil" and that "[a]ll other environmental issues at the Property have been resolved." *Id.* at 71. The FOST concluded that the Property "is environmentally suitable for transfer by deed for commercial use, subject to compliance with the covenants, conditions, and restrictions set forth [therein]." *Id.* at 93.

Regarding the deed for transfer of the Property, the FOST required that it "include a covenant by the United States, made pursuant to the provisions of CERCLA § 120(h)(3)(A)(ii)(II), warranting that any remedial or corrective action found to be necessary after the date of the deed shall be conducted by the United States." [ECF 66-2] at 90. CERCLA applies to "any contract for the sale or other transfer of real property which is owned by the

---

[1] The Court cites to the facts contained in the government's motion for summary judgment, *see* Def.'s Mot. for Summ. J. [ECF 66], to the extent that Hamilton does not dispute such facts—as demonstrated in their response to the government's motion, *see* Pl.'s Opp. to Def.'s Mot. for Summ. J. [ECF 67] at 8-13.

[2] All page numbers referencing the parties' briefs refer to the page numbers generated by the CM/ECF system.

United States and on which any hazardous substance was stored for one year or more, known to have been released, or disposed of." 42 U.S.C. § 9620(h)(1). Under CERCLA, any contract for the sale of property must include a notice of "the type and quantity of such hazardous substances" and "the time at which [] storage, release, or disposal took place." *Id.* § 9620(h)(3)(i)(I-II). CERCLA contains a list of covered hazardous substances. *See id.* § 9601(14); 40 C.F.R. § 302.4(a). Petroleum is not included on the list. *See id.*

On October 23, 2003, the DTSC issued a letter titled "Concurrence with Final Finding of Suitability to Transfer (FOST) . . . ." [ECF 66-2] at 104. In the letter, the DTSC and RWQCB indicated that they reviewed the FOST and concurred with its findings. *Id.* Further, the DTSC and RWQCB acknowledged that "[t]he FOST finds the property suitable for its intended use, subject to compliance with [its] covenants, conditions, and restrictions." *Id.* at 105.

Prior to finalizing its purchase of the Property from the Navy, "the NPFA demanded that the Navy remove all petroleum-impacted soil." [ECF 66] at 11. The Navy refused on the grounds that it was not required to do so to make the Property suitable for commercial use. *Id.* Consequently, the transfer of the Property to the NPFA was never finalized. [ECF 66-1] at 142. Subsequently, the Navy sold the Property to Hamilton at a public auction in 2004. [ECF 66] at 11-12. Before the sale, the Navy, DTSC, and RWQCB executed a Covenant to Restrict Use of Property (the "CRUP"). *See* [ECF 66-2] at 292-311. The CRUP stated that the Property was "affected by petroleum contamination in soil and groundwater," that "[p]etroleum hydrocarbon contamination is present in the soil of all parcels of the Property," and that "[p]etroleum hydrocarbon and metals-impacted soil is present in the soil under a portion of [the gas station building]." *Id.* at 294.

At auction, Hamilton submitted a $900,000 bid, which the Navy accepted. [ECF 66] at 12. Prior to finalizing the sale, Hamilton hired a private environmental consultant to conduct an environmental due diligence evaluation. *Id.* at 13; First Am. Compl. [ECF 19] ¶ 31. The evaluation noted that a risk assessment was conducted in 2001 and that the assessors found "that the site was suitable for commercial/industrial use." [ECF 66] at 13; [ECF 19] ¶ 31. The evaluation also indicated that "a variance or termination of the Residential Use Restriction may be possible to change the site use restrictions from commercial/industrial to residential." [ECF 19] ¶ 32; *see also* [ECF 66] at 14.

Hamilton and the Navy finalized the sale of the Property and executed the transfer deed (the "Deed") on April 18, 2005. [ECF 66] at 14; [ECF 66-2] at 275. Under the Deed, Hamilton "acknowledges that it has inspected, is aware of, and accepts the condition and state of repair of the Property, and that the Property is conveyed 'as is.'" [ECF 66-2] at 277. Although the Deed contains a restriction prohibiting the use of the Property for residential purposes, it permits Hamilton to request a variance or termination of the restriction from the Navy, subject to approval by state and local government agencies. *Id.* at 278-79. Further, the Deed references the FOST and states that the Property is subject to the CRUP. *Id.* at 275-77.

From 2005 to 2008, Hamilton sought to develop the Property for commercial purposes. [ECF 66] at 17; [ECF 19] ¶ 42. However, these plans did not materialize. *Id.* Beginning in 2013, Hamilton pursued development of the Property for residential purposes. [ECF 66] at 17; [ECF

19] at ¶¶ 43, 46. After several years of coordinating with the City of Novato and RWQCB, Hamilton began the clean-up and remediation process for the subsurface soil and groundwater to bring the Property up to residential standards. [ECF 19] ¶¶ 47, 51. As part of this effort, Hamilton removed over 10,000 tons of impacted soil from the Property and replaced it with clean fill. *Id.* ¶ 52. Hamilton also conducted additional soil vapor sampling to analyze and improve the Property's suitability for residential use. *Id.* ¶¶ 51-60.

In January 2019, Hamilton's environmental consultant conducted additional soil gas sampling at various locations and depths on the Property and analyzed the samples for various gasoline constituents, including chloroform. [ECF 66] at 19. Based on the soil analysis results it received from Hamilton, the RWQCB responded as follows:

> Current soil vapor results indicate there may be additional secondary source contamination. Based on the soil vapor data, the site is not suitable for unrestricted land use, but it may be suitable for residential with effective indoor air mitigation measures. Additional soil vapor monitoring may be necessary for the following reasons: (1) determine if additional work is necessary to clean up the site to residential standards; (2) human health risk assessment; and (3) determine if the Land Use Control can be removed or modified to allow unrestricted or residential development with indoor air mitigation measures.

[ECF 66-2] at 789. In June 2019, Hamilton's consultant prepared a "Soil Vapor Investigation Report and Work Plan." *Id.* at 799. The report indicated that "[c]hloroform was detected in two samples." *Id.* at 809.

On June 13, 2019, Hamilton sent an email to the RWQCB and attached the Soil Vapor Investigation Report and Work Plan. [ECF 66-2] at 797. Hamilton copied two Navy officials—one of whom was employed at the West Coast Base Realignment and Closure Program Management Office. *Id.*; Pl.'s Resp. [ECF 67] at 17. The email stated the following:

> Please find attached a copy of the Soil Vapor Investigation Report and Work Plan prepared by [our consultant] dated 6/12/19. As the plan indicates, we have proposed to install 7 additional soil vapor wells in response to agency comments, and plan to conduct a second round of sampling to account for seasonal variability. We plan to install the wells the second week in July and then will conduct sampling shortly thereafter.
>
> Now that the [RWQCB] has taken over as the lead agency we are hopeful that the process going forward will be more streamlined. Given this change, after you have had an opportunity to review the attached work plan, and in advance of the second round of testing, we would like to have a phone call or meeting with the [RWQCB] to discuss technical & logistical issues.

[ECF 66-2] at 797. The record does not include any further communications stemming from this email.

In a separate communication from Hamilton to the Navy dated October 8, 2019, Hamilton stated:

> Thanks again for taking the time today to review the Navy's process with respect to lifting/modifying CRUPs. I found it helpful and I'm certain the folks at the RWQCB did as well.
>
> As we touched upon at the end of our call, the current owners purchased the site from the Navy with the understanding that it had been cleaned to a level appropriate for Commercial Development. The only prohibited uses were called out in the CRUP – Residential and Day Care Facilities. The site was cleared for commercial development and we entitled a 20,000 sf office project at the site with this understanding.
>
> Now, over a decade later, after spending well over a million dollars on soil remediation, the [RWQCB] is telling us that the Soil Vapor levels at the site are not currently, and never have been, appropriate for a commercial use. Gratefully, there is a path forward by means of a Soil Vapor Extraction System and a Vapor Mitigation System. These are very expensive undertakings, however, and we think it's clear that the Navy bears some responsibility for cleaning up the soil vapor plume at this site.
>
> Can you please help direct me to the appropriate person at the Navy to whom I should take this issue for further discussion?

[ECF 66-2] at 975. The Navy responded on October 9, 2019, directing Hamilton to "the base closure manager for [the Department of Defense Housing Facility] Novato." *Id.* at 976. The response email further stated:

> [The base closure manager] would be the responsible person in our office to handle your concerns and walk through the process when we believe a claim is warranted. [He] is copied . . . .
>
> We were equally surprised by [RWQCB's] position that commercial should have never been authorized. My personal opinion is that [RWQCB] may not have all the historical details and our logic and conclusions at the time were perhaps not so faulty. As science and regulatory perspective changes over time, we can't hold a lens to our program decisions so strictly, particularly when both regulatory agencies approved the 2001 final revised risk assessment.

> Our team owes you several different items as a result from the call.
> I'll try to send over some example[s] of Notices of Release/Deed
> Amendments. Again, I don't think we're in the scenario of a full
> restriction release, so the [Notice of Release] is probably not the
> appropriate form. Once we determine who is our supporting counsel
> in this office, I'll provide some additional insight based on their
> advice.

*Id.* The record does not include any further communications in connection with this email
exchange.

On March 6, 2020, Hamilton emailed the Navy stating that its attorney would be
contacting the Navy to request a meeting. [ECF 66-2] at 983. Thereafter, on April 1, 2020,
Hamilton's attorney sent a letter to the Navy. *Id.* 984. In the letter, Hamilton explained that
"the [RWQCB] ha[d] determined as of October 2019 that the [Property] never ha[d] been
suitable to use for commercial building purposes." *Id.* Hamilton further explained that it "ha[d]
expended a considerable amount of effort and money to bring th[e] site to residential
development standards and th[e] site is still not suitable even for commercial development,
despite representations by the Navy to the contrary." *Id.* According to Hamilton, the Deed
"contains the necessary warranty regarding cleanup and [a]dditional [r]emediation
[o]bligation[s]." *Id.* Hamilton sought to discuss with the Navy "the status of the site and the need
for additional site remediation since [Hamilton] acquired the site in 2005." *Id.* Hamilton filed its
original complaint in this Court on September 29, 2020. Compl. [ECF 1]. Hamilton amended its
complaint on April 5, 2021. [ECF 19].

## II.    PROCEDURAL HISTORY

In its amended complaint, Hamilton alleges that the Navy breached its obligations under
the Deed by failing to adequately perform ongoing corrective action as required by the Deed;
failing to ensure that the Property was suitable for commercial development; and failing to
remediate the Property, either through performance or payment of costs, after Hamilton provided
the Navy with notice that hazardous substances, including petroleum, existed on the Property
prior to the date of the Deed. [ECF 19] ¶ 69(a)-(c). Hamilton also alleges that the Navy breached
the implied duty of good faith and fair dealing "by failing to diligently perform[] all ongoing
obligations required by the Deed, including performing ongoing corrective actions." *Id.* ¶ 75.

On May 7, 2021, the government moved to dismiss Hamilton's complaint for lack of
subject matter jurisdiction and for failure to state a claim pursuant to RCFC 12(b)(1) and RCFC
12(b)(6). Def.'s Mot. to Dismiss [ECF 22]. On July 20, 2022, the Court granted-in-part and
denied-in-part the government's motion. *Hamilton Square, LLC v. United States*, 160 Fed. Cl.
617 (2022). The Court found that "Hamilton [] sufficiently stated a breach of contract claim
based on the Navy's alleged failure to remediate the Property after Hamilton provided
notification of newly discovered chloroform and petroleum contamination" and that "Hamilton []
sufficiently stated a claim for breach of the implied duty of good faith and fair dealing." *Id.* at
624. The Court dismissed Hamilton's other breach of contract claims. *Id.*

On August 16, 2022, the government filed a motion for reconsideration pursuant to RCFC 54 and 59(a)(1)(A)-(B), requesting that the Court reconsider its finding that Hamilton "sufficiently stated a timely claim for breach of contract based on the Navy's alleged failure to remediate newly discovered contaminants on the [P]roperty." Def.'s Mot. for Recons. [ECF 37] at 5. The government also requested that the Court reconsider its finding that Hamilton "sufficiently stated a claim for breach of the implied duty of good faith and fair dealing based on the Navy's alleged failure to perform ongoing corrective actions to protect human health and the environment and to ensure the [P]roperty was suitable for commercial development." *Id.* The Court denied the government's motion on December 1, 2022. *Hamilton Square, LLC v. United States*, No. 20-1285, 2022 WL 17351507, at *1 (Fed. Cl. Dec. 1, 2022). The Court concluded that reconsideration was not warranted, and that further discovery and factual development was necessary to resolve Hamilton's remaining claims. *Id.* at *3.

Thereafter, in accordance with the Court's scheduling order, [ECF 45], the government filed an answer to Hamilton's amended complaint on January 13, 2023, [ECF 46]. The parties then conducted discovery. During discovery, the parties agreed to bifurcate the case into two phases—one for liability and, if necessary, one for damages. [ECF 60] at 2. Fact discovery on liability closed on July 16, 2024. *Id.* Next, the parties proposed a schedule for filing cross-motions for summary judgment. [ECF 64]. Pursuant to that schedule, which the Court adopted, Order [ECF 65], the government filed a motion for summary judgment on November 8, 2024, [ECF 66]. Hamilton opposed the government's motion on December 9, 2024, [ECF 67], and the government replied thereto on December 23, 2024, Def.'s Reply [ECF 73]. Hamilton did not cross-move for summary judgment. The Court held oral argument on the government's motion for summary judgment on June 25, 2025. Order [ECF 86].

## III.    STANDARDS OF REVIEW

Summary judgment may be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see Agility Def. & Gov't Servs., Inc. v. United States*, 115 Fed. Cl. 247, 250 (2014). "An issue is genuine if it 'may reasonably be resolved in favor of either party.'" *Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 405 (2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "A fact is material if it will make a difference in the result of a case under the governing law." *Beres v. United States,* 143 Fed. Cl. 27, 61 (2019) (citing *Anderson*, 477 U.S. at 248).

"[A]t the summary judgment stage[,] the judge's function is not [] to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law." *Beres*, 143 Fed. Cl. at 62 (citing *Anderson*, 477 U.S. at 250-52; *Jay v. Sec'y of Dep't of Health & Hum. Servs.*, 998 F.2d 979, 982 (Fed. Cir. 1993); *Leggitte v. United States*, 104 Fed. Cl. 315, 316 (2012)). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[The moving party's] motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file." *Rice Sys., Inc. v. United States*, 62 Fed. Cl.

608, 618 (2004) (citing *Celotex*, 477 U.S. at 324). "If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists." *Id.* (citing *Celotex*, 477 U.S. at 322). "[T]o prevail . . . the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions." *Id.* (citing *Celotex*, 477 U.S. at 324); *see also Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed. Cir. 2007) (stating that "the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence").

The court must draw all inferences from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). "[I]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact," the court shall grant summary judgment to the moving party. *Holland v. United States*, 57 Fed. Cl. 540, 560 (2003) (quoting RCFC 56(c)). Further, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). However, if "there is sufficient evidence favoring the nonmoving party for a [trier of fact] to return a verdict for that party," summary judgment is not appropriate. *Anderson*, 477 U.S. at 249.

## IV.    ANALYSIS

In its motion, the government argues that it is entitled to summary judgment on Hamilton's claims of breach of contract and breach of the implied duty of good faith and fair dealing. First, the government argues that Hamilton failed to provide notice of the alleged newly discovered contaminants as required by the Deed and that therefore the government cannot be found to have breached a duty to remediate. [ECF 66] at 25-30. Next, the government contends that, even if the Court finds that Hamilton complied with the Deed's notice requirements, the Navy did not have any further remediation obligations with respect to the petroleum or chloroform. *Id.* at 30-37. Lastly, the government asserts that Hamilton's breach of the implied duty of good faith and fair dealing claim "is factually and legally unsupportable." *Id.* at 37-41. As explained below, the Court finds that (i) the notice obligations under the Deed are not conditions precedent to the Navy's remediation obligations, (ii) there are genuine issues of material fact regarding the chloroform contamination on the Property that preclude the granting of summary judgment, (iii) the government is entitled to summary judgment on Hamilton's breach of contract claim regarding the petroleum contamination on the Property, and (iv) the government is entitled to summary judgment on Hamilton's breach of the implied duty of good faith and fair dealing claim.

### A.    Hamilton's Notice Obligation

The government argues that Hamilton "failed to provide notification of its alleged discoveries as required by the Deed, and as such, fails to state a valid breach of contract claim." [ECF 66] at 25. According to the government, since "[t]he Navy was not on notice about the emergence of any previously unidentified contaminant, [] it cannot have breached a duty to remediate, and summary judgment should be granted in the Government's favor." *Id*. Hamilton

counters that it "complied with the notice requirements of the Deed, notwithstanding that notice was not mailed to [the Navy,]" and that the Navy "received actual notice of previously unidentified contamination." [ECF 67] at 14. According to Hamilton, the plain text of the Deed "indicate[s] that notice of previously unidentified contamination is *not* required . . . to trigger the Navy's response action obligations" and that "[t]he Deed either explicitly does *not* require notice . . . , or the text is too ambiguous for the Court to impose a new draconian condition precedent absent from the Deed." *Id.* at 16. Hamilton adds that, "[i]n either case, summary judgment for the Navy based on its contrary interpretation should be denied." *Id.* The Court finds that the government is not entitled to summary judgment on Hamilton's breach of contract claims on the basis that Hamilton failed to comply with the Deed's notification requirements because the notification requirements are not conditions precedent to the Navy's remediation obligations.

"Contract interpretation begins with the language of the written agreement." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). The terms of the contract are given "their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." *Harris v. Dep't of Veteran Affs.*, 142 F.3d 1463, 1467 (Fed. Cir. 1998). A contract should "be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996)). This is because contract provisions "must be so construed as to effectuate [the contract's] spirit and purpose." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (quoting *Arizona v. United States*, 216 Ct. Cl. 221, 236 (1978)). "[A]n interpretation which gives a reasonable meaning to all of [the contract's] parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Id.*

A breach of contract is a "[f]ailure to perform a contractual duty when it is due." *Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995), *aff'd and remanded*, 518 U.S. 839 (1996) (citing Restatement (Second) of Contracts § 235(2) (Am. L. Inst. 1981) ("Restatement (Second) Contracts")). "Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused." *Sys. Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 173 (2005) (quoting Restatement (Second) Contracts § 225) (internal quotation marks omitted). "A condition 'is an event, not certain to occur, which must occur . . . before performance under a contract becomes due." *Sys. Fuels, Inc.*, 65 Fed. Cl. at 173 (quoting Restatement (Second) of Contracts § 224). "A contractual condition is to be distinguished from a promise, obligation, or covenant in that a condition creates no right or duty in and of itself, but merely acts as a limiting or modifying contract provision." *Favell v. United States,* 16 Cl. Ct. 700, 721 (1989). "If a condition does not occur, whether through breach or other cause, the party fails to meet the condition, and acquires no right to enforce the promise." *Id.* "A contractual promise or obligation, on the other hand, raises a duty to perform a service and its breach subjects the promisor to liability and damages, but does not necessarily excuse performance by the other contracting party." *Id.* (citing *United States v. Schaeffer*, 319 F.2d 907 (9th Cir.1963), *cert. denied*, 376 U.S. 943 (1964)). "Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language." *RT Computer Graphics, Inc. v. United States*, 44 Fed. Cl. 747, 756 (1999) (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 559 n.7 (9th Cir. 1990)) (internal quotation marks omitted); *see also Bitmanagement Software*

*GmbH v. United States*, 989 F.3d 938, 950 (Fed. Cir. 2021) (stating that the "[t]erms of a . . . contract are presumed to be covenants, rather than conditions, unless it is clear that a condition precedent was intended").

In the instant case, Section II.K of the Deed contains several "notices, assurances, covenants and declarations [that] apply to the Property." [ECF 66-2] at 281. Hamilton relies on Section II.K(3) to support its claim that the Navy has a duty to conduct remedial action on the newly discovered chloroform and petroleum. [ECF 67] at 24. In its motion, the government contends that Hamilton had to comply with the notification requirements under Sections II.K(5) and IV before it could bring a breach of contract claim based on the Navy's alleged failure to perform additional remediation. [ECF 66] at 31. Despite the government's contentions, however, neither the notification requirements in Section II.K(5) nor those in Section IV are conditions precedent to the Navy's remediation obligations. Section II.K(3) states:

> (3) <u>Additional Remediation Obligation</u>. GRANTOR covenants for the benefit of GRANTEE, its successors and assigns, as a covenant running with the land, that GRANTOR shall conduct any additional remedial action found to be necessary after the date of this Deed for any hazardous substance existing on the Property prior to the date of this Deed. This covenant shall not apply to the extent that the GRANTEE caused or contributed to any release or threatened release of any hazardous substance, pollutant, or contaminant.

[ECF 66-2] at 281. Based on its plain text, Section II.K(3) does not contain a condition precedent that requires Hamilton to notify the Navy of the need for additional remedial action. *See Sys. Fuel, Inc.*, 65 Fed. Cl. at 173 (finding that the payment of a fee was a condition precedent to a delivery obligation under the contract because the unambiguous text of the contract "contractually linked" the payment and delivery terms). Instead, Section II.K(3) is a stand-alone covenant that obligates the Navy to conduct additional remediation under certain circumstances.

Like Section II.K(3), Section II.K(5) also contains a stand-alone covenant, albeit one that obligates Hamilton to do certain things. It states:

> (5) <u>Notification</u>. GRANTEE agrees, on behalf of itself and its successors and assigns, as a covenant running with the land, that it shall:
>
> (a) Notify GRANTOR in writing within 90 days after learning of any previously unidentified condition of the Property that suggests a response action is necessary, or, within 15 days after receiving notice of a claim by Federal, State or local regulators, or other third parties, of the existence of any condition on the Property that suggests a response action is necessary. If GRANTEE, or its successors and assigns, is served with a complaint or written notice of a claim by Federal, State or local regulators, the served party shall

> provide GRANTOR with a copy of such document not later than 15 days following service of such document; and
>
> (b) Furnish GRANTOR copies of pertinent papers received by GRANTEE or any successors and assigns; and
>
> (c) Provide, upon written notification and request of GRANTOR, reasonable access to the records and personnel of GRANTEE, or any successors and assigns, for purposes of defending or resolving the need for additional response action.

[ECF 66-2] at 282. Thus, under Section II.K(5), Hamilton must notify the Navy of a previously unidentified condition on the Property or of a claim by government regulators due to a condition on the Property. Further, Hamilton must provide the Navy with relevant records and access to the Property. Notably, this Section does not describe a condition that must occur for Hamilton to enforce the Navy's covenant to perform additional remediation. Rather, it imposes separate obligations on Hamilton and provides the Navy with a right to enforce such obligations against Hamilton. In other words, Section II.K(5) does not limit or modify the Navy's remediation obligations under Section II.K(3). *See Favell*, 16 Cl. Ct. at 721 (explaining that a condition does not create a right or duty but instead limits or modifies a contract provision). Instead, Section II.K(5) creates standalone rights and duties. *See Stone Forest Indus., Inc. v. United States*, 26 Cl. Ct. 410, 417 (1992) (finding that a "time limitation is not a covenant . . . because it does not create a right or duty in and of itself" and because it "merely limits the contractor's right to recover the refunds"). Therefore, for the Court to require Hamilton to first comply with its obligations under Section II.K(5) prior to enforcing the Navy's remediation obligations under Section II.K(3), the Court would have to interpret Hamilton's obligations under Section II.K(5) as conditions precedent to the Navy's remediation obligations under Section II.K(3). The language of the Deed does not support such an interpretation. While "[n]o particular form of language is necessary to make an event a condition," Restatement (Second) of Contracts § 226, the Court will not create a condition precedent where it is not supported by the plain language of the Deed, *see RT Computer Graphics, Inc.*, 44 Fed. Cl. at 756 (finding no condition precedent where the contract did not contain "a clear signal" that the term constituted a condition precedent).

The government also argues that Hamilton failed to comply with the notification requirements in Section IV by not providing written notice of the newly discovered contaminants to the specific addresses listed in the Deed. [ECF 66] at 26. However, like the plain language of the notification requirements in Section II.K(5), the plain language of the requirements of Section IV cannot be read to create a condition precedent to the Navy's remediation obligations. Moreover, based on its plain language, Section IV does not restrict the validity of notices under the Deed to only those notices that are in writing and delivered to physical addresses. Rather, it contains an overarching provision that defines what constitutes sufficient notice under the Deed. In relevant part, Section IV states: "Notices shall be deemed sufficient under this Deed if made in writing and submitted to the following addresses (or to any new or substitute address hereinafter specified, in a writing theretofore delivered in accordance with the notice procedures set forth herein by the intended recipient of such notice)." [ECF 66-2] at 283. It then lists the physical

addresses for each recipient. *Id.* Thus, while Section IV describes what type of notice is sufficient under the Deed, it does not state that such notice is a condition precedent to the enforcement of other obligations set forth in the Deed. *See RT Computer Graphics, Inc.*, 44 Fed. Cl. at 756. It also does not state that the type of notice described therein is the only form of acceptable notice. Instead, it provides that a written notice delivered in the manner prescribed in Section IV will be sufficient under any circumstance. *See* 15 Williston on Contracts § 48:7 (4th ed. 2025) (stating that "the parties may contract respecting how and to whom notice shall be given, and when they do so, the giving of notice by the method specified in the contract is sufficient whether it results in actual notice or not").[3]

## B.    The Navy's Obligation to Remediate Chloroform

Regarding the chloroform contamination, the government posits that "Hamilton must demonstrate under Section K of the Deed that it meets the threshold for remediation responsibility" and that this threshold "is to demonstrate that [the chloroform] was present on the [] Property prior to transfer and as a result of the Navy's activities." [ECF 66] at 30. The government asserts that "[n]ot only has Hamilton failed to meet this threshold – the facts themselves do not support Hamilton's arguments." *Id.* According to the government, "after over a year of discovery, Hamilton has failed to establish that chloroform was even *present* on the [] Property prior to transfer." *Id.* at 31. Hamilton responds that "[t]he Navy does not dispute that Hamilton detected chloroform on the Property in 2019" and that "[t]he Navy instead relies on conclusory statements to argue that the chloroform was not present prior to the recording of the Deed." [ECF 67] at 24. Hamilton contends that "[t]he detection of chloroform in 2019 raises a genuine issue of material fact about whether chloroform *existed* on the Property prior to transfer," thereby triggering the government's remediation obligation under Section II.K(3) of the deed. *Id.* at 25. The Court finds that there is a genuine issue of material fact as to whether the Navy breached its obligation under the Deed to perform remedial action with respect to the newly discovered chloroform and that the government is not entitled to summary judgment on this claim.

CERCLA applies to "any contract for the sale or other transfer of real property which is owned by the United States and on which any hazardous substance was stored for one year or more, known to have been released, or disposed of." 42 U.S.C. § 9620(h)(1). Under CERCLA, any contract for the sale of property must include a notice of "the type and quantity of such hazardous substances" and "the time at which such storage, release, or disposal took place." *Id.* § 9620(h)(3)(A)(i)(I-II). CERCLA lists the covered hazardous substances. *See id.* § 9601(14); 40 C.F.R. § 302.4(a). Where property is transferred by the government to another party, CERCLA also mandates that any contract for the sale of property include a covenant warranting that "any remedial action found to be necessary after the date of [the] transfer shall be conducted by the United States." 42 U.S.C. § 9620(h)(3)(ii)(II). In the instant case, Exhibit D to the Deed

---

[3] Because the Court finds that the notification provisions in Sections II.K(5) and IV are not conditions precedent to the Navy's remediation obligations under the Deed, the Court need not address whether Hamilton complied with its obligations to provide notice. If the Court were to find that Hamilton failed to comply with its notification obligations under the Deed, such failure may constitute a breach of contract that subjects Hamilton to liability and damages; however, such a breach would not necessarily excuse the Navy from performing its remediation obligations under the Deed. *See Favell*, 16 Cl. Ct. at 721.

identified "Lead" as the only hazardous substance known to have been stored, released, or disposed of on the Property. [ECF 66-2] at 290. Additionally, Section II.K(3) of the Deed provided that the Navy "covenants, for the benefit of [Hamilton] . . . that [the Navy] shall conduct any additional remedial action found to be necessary after the date of th[e] Deed for any hazardous substance existing on the Property prior to the date of th[e] Deed." *Id.* at 281.

Chloroform is a hazardous substance under CERCLA. 40 C.F.R. § 302.4(a).[4] It is also undisputed that, in January 2019, Hamilton's environmental consultant discovered chloroform on the Property after the parties executed the Deed. [ECF 66] at 19 (the government acknowledging Hamilton's discovery of chloroform). Thus, the issue before the Court is whether the newly discovered chloroform existed on the Property prior to the date of the Deed and, if so, whether additional remedial action under Section II.K(3) is necessary. At this stage, the Court "must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law." *Beres*, 143 Fed. Cl. at 62 (citing *Anderson*, 477 U.S. at 250-52; *Jay*, 998 F.2d at 982).

To satisfy its burden, the government relies on sampling conducted prior to transfer to show that "there was no known release or disposal of chloroform on the [] Property." [ECF 66] at 32. Additionally, the government relies on the declaration of a Navy official, who states that he "reviewed reports and sampling data related to the Navy's cleanup of the [] Property prior to transfer." [ECF 66-1] at 144. He explains: "As part of the Navy's cleanup, sampling for gasoline constituents, volatile organic compounds (including chloroform) . . . in soil, groundwater, and soil gas . . . were collected and analyzed, using analytical methods approved by the [DTSC] and the [RWQCB]" and that "[t]he sampling data confirmed that there was no known release or disposal of [c]hloroform at the [] Property, and therefore no need to further investigate chloroform." *Id.* The official further explains that "the Navy issued a [FOST] for the [] Property" and an amended FOST, and that the FOST "did not identify chloroform as a hazardous substance, since there had been no storage, release, or disposal of that chemical on the [] Property." *Id.* In addition to referencing the Navy's sampling data, the official references sampling conducted by Hamilton's environmental consultant in May 2005 and notes that "[n]one of the sampling results (including soil vapor) indicated the presence of chloroform at the [] Property." *Id.* at 145. Based on this declaration and the referenced sampling data and reports, the Court finds that the government has shown the absence of a genuine issue on whether chloroform existed on the Property at the time of transfer. Therefore, the burden shifts to Hamilton to show a genuine issue of material fact. *See Rice Sys., Inc.*, 62 Fed. Cl. at 618 (citing *Celotex*, 477 U.S. at 322).

Hamilton asserts that "[t]he detection of chloroform in 2019 raises a genuine issue of material fact about whether chloroform *existed* on the Property prior to transfer." [ECF 67] at 25. It argues that the Navy's testing prior to transfer "could not 'confirm' that there was no chloroform *existing* on the Property—it could confirm only that chloroform was not detected by

---

[4] Chloroform "is a colorless liquid with a pleasant, nonirritating odor and a slightly sweet taste." National Institute of Health, National Library of Medicine, National Center for Biotechnology Information, *Compound Summary, Chloroform*, https://pubchem.ncbi.nlm.nih.gov/compound/Chloroform (last visited July 9, 2025). Chloroform "can [] be formed in small amounts when chlorine is added to water." *Id.* It is "[u]sed as a solvent, to make other chemicals, as a fumigant," and "for extraction and spot cleaning." *Id.*

that study in selected areas of the Property at that specific time." *Id.* In response to a government interrogatory, Hamilton stated: "Since the date of transfer, Hamilton has taken no action that would result in the introduction of chloroform to the [] Property." [ECF 66-1] at 117. Hamilton further stated that executive officers for Hamilton and related businesses "ha[ve] knowledge as to the fact that Hamilton took no actions that would result in the introduction of chloroform to the [] Property." *Id.* According to Hamilton, the Navy ignores the fact "that Hamilton has owned the land only in an undeveloped condition since 2005, but the Navy operated an industrial gas station, tank farm, and public works support facility on the Property for twenty years." [ECF 67] at 25. The Court finds that Hamilton has met its burden to demonstrate the existence of a genuine issue of material fact—namely, whether the newly discovered chloroform existed on the property prior to the date of the Deed. Based on the facts of this case and Hamilton's interrogatory response, a rational trier of fact could resolve this issue in Hamilton's favor.[5]

In its motion, the government does not address the secondary determination of whether additional remedial action is necessary under Section II.K(3) because of chloroform contamination. *See generally* [ECF 66]. If chloroform contamination is found to have existed on the Property prior to the date of the Deed, Section II.K(3) requires that the Navy perform "additional remedial action . . . found to be necessary." [ECF 66-2] at 281. Thus, in addition to the origin of the chloroform contamination, the Court views the extent of the chloroform contamination on the Property and whether such contamination requires remedial action under the Deed as unresolved issues that cannot be resolved on the instant summary judgment motion.

## C.    The Navy's Obligation to Remediate Petroleum

The government argues that, to prevail on its breach of contract claim regarding petroleum contamination, "Hamilton must demonstrate under Section II.L of the Deed that, as a threshold matter, it [] learned of a previously unidentified release or threatened release of petroleum," [ECF 66] at 32, and that "Hamilton [] never discovered a previously unidentified release of petroleum," *id.* at 33. As it argued with respect to Hamilton's chloroform contamination claim, the government asserts that "after over a year of discovery, Hamilton fail[ed] to provide *any* documentation of a previously unidentified [petroleum] release." *Id.* at 34. The government further states that Section II.L of the Deed "requires only notification . . . , not

---

[5] In its opposition, Hamilton states that "[e]xpert evaluation on the Navy's testing, historical chloroform uses, and Hamilton's activities since transfer is required before anyone can 'confirm' that the chloroform detected in 2019 did not predate transfer." [ECF 67] at 25. The record is unclear on the deadline for expert discovery. Based on the parties' Joint Preliminary Status Report, the Court issued a scheduling order providing that "[d]iscovery shall close on September 25, 2023. [ECF 50] (emphasis omitted). Thereafter, the deadline was extended multiple times, *see* [ECF 52, 55, 58, 60, 62], with discovery ultimately closing on August 9, 2024, [ECF 62]. During discovery, the parties agreed to bifurcate the case into separate phases for liability and damages, [ECF 60] at 2, but disagreed on whether expert discovery on damages was necessary, *see* Joint Status Report [ECF 59] at 4. At that point, Hamilton argued that "the time for expert discovery ha[d] not expired," *id.* at 5, and that "[e]xpert analysis [wa]s necessary" to determine the portion of its costs incurred to remediate the Property to commercial standards, *id.* at 4. The government countered that "[t]he Court's scheduling orders have set one time period for all discovery," *id.* at 6, and that Hamilton failed to timely raise "[e]xpert testimony about damages," *id.* The Court will address the lack of clarity regarding the status of discovery when it sets a schedule for further proceedings. At a minimum, however, it appears that the parties anticipated expert discovery at the damages phase. It may be the case that issues raised during such expert discovery—issues relating to the origin and extent of chloroform contamination—implicate liability as well.

remediation." *Id.* Because "CERCLA excludes petroleum or its derivatives from the definition of hazardous substances," *id.* at 35, the government contends that the Navy's remediation obligations under Section II.K of the Deed are not triggered, *id.* at 37.

According to Hamilton, the government's contention that it failed to identify any previously unidentified petroleum at the Property "is wrong [because] the petroleum contamination discovered at the Property by Hamilton far exceeds the scope of the contamination disclosed by the Navy's FOST." [ECF 67] at 26. Rather, Hamilton argues that "[t]he actual petroleum contamination was larger than disclosed, was located in more areas than disclosed, and was more severe than disclosed." *Id.* Because "[t]his larger, more expansive, and more severe contamination was not previously identified at the time of the transfer . . . [Hamilton claims that] the Navy is obligated by the Deed to remediate it." *Id.* Hamilton argues that since "[t]he Navy denies these facts, [] a genuine issue of material fact remains in dispute and summary judgment should be denied." *Id.* Additionally, regarding the Navy's obligation to conduct remediation of petroleum under the Deed, Hamilton asserts that the reference to Section II.K(5) in Section II.L demonstrates that notification of a previously unidentified release of petroleum under Section II.L requires that "the Navy [] assess whether a 'response action' is required." *Id.* at 30. Although Hamilton concedes "that CERCLA excludes petroleum . . . [it nevertheless] contends that the Navy *contracted* to perform remediation of contamination encompassing a broader range of pollutants than those covered by CERCLA." *Id.*

The Court finds that no genuine issue of material fact exists as to whether the Navy breached its obligation under the Deed to perform remedial action with respect to the petroleum contamination and that the government is entitled to summary judgment on this claim. Section II.L of the Deed provides:

> **L.    PETROLEUM.** GRANTEE agrees, on behalf of itself and its successors and assigns, and every successor in interest to the Property herein described, or any part thereof, as a covenant running with the land, that upon learning of *any previously unidentified release or threatened release* of petroleum or petroleum derivative (including without limitation [Methyl Tertiary Butyl Ether ("MTBE")]) from, on, under or about the Property and any related soils or ground or surface waters, which may have been associated with Department of Defense activities at or about the Property, GRANTEE will notify GRANTOR by following the notification procedures set forth in subsection K(5) above.

[ECF 66-2] at 282 (emphasis added). As stated above, the notification procedures in Section II.K(5)(a) require that Hamilton notify the Navy "in writing within 90 days after learning of *any previously unidentified condition* of the Property that suggests a response action is necessary." *Id.* (emphasis added). Therefore, before reaching the issue of whether the Navy has an obligation under the Deed to remediate petroleum contamination, the Court must first determine if there is a genuine issue with respect to whether such contamination constitutes a "previously unidentified release or threatened release." *Id.*

Relying on the FOST and the CRUP, the government asserts that "[t]he undisputed facts . . . show that Hamilton ha[d] not learned of a previously unidentified release of petroleum." [ECF 66] at 33. Rather, the government contends that "Hamilton purchased the [] Property fully aware of the fact that it contained petroleum" and that "[t]he [June 13, 2019] Soil Report does not show that the contaminant measurements relate to anything more than the petroleum already identified by the Navy as extant on the [P]roperty pre-transfer." *Id.* at 34. According to the government, it "discharged [its] burden by showing an absence of evidence to support Hamilton's case." *Id.* (citing *Celotex*, 477 U.S. 322-23). The Court agrees that the government has met its burden by showing the absence of a genuine issue of material fact on the threshold determination of whether the petroleum contamination constitutes a previously unidentified release or threatened release.

The Deed states that the Navy "has found and determined that the [P]roperty is suitable for transfer pursuant to the [FOST]." [ECF 66-2] at 275. It further states that "[t]he FOST . . . reference[s] environmental conditions on the Property" and that Hamilton "acknowledges that it has received copies of the . . . FOST . . . , and that all documents referenced therein have been made available to [Hamilton] for inspection and copying." *Id.* at 277. With respect to the CRUP, the Deed states that "the Property is subject to the provisions of a certain [CRUP]." *Id.* at 276. Both the FOST and CRUP identify existing petroleum contamination on the Property. *See id.* at 71, 294.

The FOST explains that "[t]he only outstanding environmental issues at the Property are petroleum contamination in groundwater and residual contamination in soil." [ECF 66-2] at 71. Additionally, it states that "[t]he Property is affected by petroleum contamination in soil and groundwater," *id.* at 79, and provides a detailed explanation of the petroleum releases on the Property, as well as on the adjacent property, *id.* at 79-80. With respect to Building 970—the former gas station—it explains the following:

> To protect the structural integrity of Building 970, excavation activities were not conducted underneath the building footers or internal walls. Limited petroleum hydrocarbon contamination is still present in these areas . . . . An estimate of the volume of hydrocarbon and metals-impacted soils remaining in place is 120 cubic yards. Soil commercial/industrial [preliminary remediation goals] were exceeded at one location on the Property . . . . Potential exposure is limited because the soils are primarily covered with asphalt and, with exception of the areas around the Building 970 foundation, are located at depths greater than 6 feet. Since the potential for exposure would likely be greater by disturbing the soils than leaving them in place and the concentrations are likely to continue to decline due to natural biodegradation processes, the soils will be left in place.

*Id.* at 83. Like the FOST, the CRUP states:

> The Property is affected by petroleum contamination in soil and groundwater. Petroleum hydrocarbon contamination is present in the

soil of all parcels of the Property. Petroleum hydrocarbon and metals-impacted soil is present in the soil under a portion of Building 970 . . . . Benzene and Ethylbenzene are each present in groundwater underlying most of the Property and [MTBE] is present in groundwater underlying all parcels of the Property.

[ECF 66-2] at 294. Based on the contents of the FOST and the CRUP, the government has established that petroleum contamination was present throughout the Property at the time of transfer and that the petroleum contamination at issue does not constitute a previously unidentified release or threatened release.

To succeed in its opposition, Hamilton must present evidence sufficient to demonstrate that there is a genuine issue as to whether the petroleum contamination constitutes a previously unidentified release or threatened release. *See Celotex*, 477 U.S. at 323-24. To that end, Hamilton asserts that "the extent of the petroleum contamination was far larger than identified in the FOST," [ECF 67] at 26; that "petroleum-contaminated soil in locations on the Property [went] well beyond the footprint of Building 970," *id.* at 27; and that "the FOST [] underestimated the severity of the contamination," *id.* at 28-29. As a result, Hamilton states that it "was required to excavate *10,680 tons* of contaminated soil . . . [and that t]his is exponentially more contaminated soil than the FOST anticipated," which shows that "the remaining petroleum contamination at the time of the transfer was *not* limited to just 120 cubic yards." *Id.* at 26-27. Hamilton relies on an October 9, 2019, report by its environmental consultant to demonstrate the severity of the petroleum contamination on the Property. *See id.* 27-28; [ECF 70] at 4. Because Hamilton misinterprets the FOST and fails to present evidence that the petroleum contamination constituted a previously unidentified release or threatened release, Hamilton has not shown that a rational trier of fact could resolve this issue in its favor.

Contrary to Hamilton's assertion, the FOST did not "represent[] that the remaining petroleum contamination was limited [to] the footprint of former Building 970 and amounted to only 120 cubic yards of soil." [ECF 67] at 12. Instead, it explains that "excavation activities were not conducted underneath [Building 970]" and that, therefore, approximately 120 cubic yards of contaminated soils remain in place in these areas. [ECF 66-2] at 83. Critically, the FOST further makes clear that petroleum contamination affects the entire Property. *See id.* at 79 (stating that "the Property is affected by petroleum contamination in soil and groundwater" and that "[a]n MTBE plume is present in groundwater and extends beneath all parcels of the Property"). This acknowledgement of petroleum contamination is mirrored in the CRUP, which states that "[p]etroleum [] contamination is present in the soil of all parcels of the Property." [ECF 66-2] at 294. Consequently, the FOST and the CRUP do not support Hamilton's assertion regarding the limited extent of the remaining petroleum contamination at the time of the transfer.

Furthermore, Hamilton has not presented any evidence that demonstrates that the petroleum contamination at issue constitutes a previously unidentified release or threatened release. Section II.L requires that Hamilton provide the Navy with notice of "any previously unidentified release or threatened release of petroleum or petroleum derivative . . . from, on, under or about the Property and any related soils or ground or surface waters." [ECF 66-2] at 282. Even if the October 9, 2019, consultant report relied upon by Hamilton demonstrates that

the extent of the petroleum contamination from the Navy's activities was larger, more widespread, and more severe than indicated in the FOST, it does not demonstrate that the petroleum contamination constitutes a previously unidentified release or threatened release. Rather, based on the evidence, a rational trier of fact could only conclude that the petroleum contamination at issue originated from either the petroleum release or threatened petroleum release already identified in the FOST and CRUP.

This conclusion is supported by the text of the FOST and CRUP. In addition to indicating that "[t]he Property is affected by petroleum contamination in soil and groundwater," [ECF 66-2] at 79, the FOST also identifies the potential threatened release of petroleum due to such contamination, *id.* at 83. It states:

> Potential exposure is limited because the soils are primarily covered with asphalt and, with exception of the areas around the Building 970 foundation, are located at depths greater than 6 feet. Since the potential for exposure would likely be greater by disturbing the soils than leaving them in place and the concentrations are likely to continue to decline due to natural biodegradation processes, the soils will be left in place.

*Id.* Similarly, under the CRUP, Hamilton is required to provide written notice to a subsequent purchaser of the Property, [ECF 66-2] at 299-300, "that a release of hazardous substances has come to be located on or beneath the Property," *id.* at 300. This further indicates that there was a known release of petroleum on the Property. It is also evident from the CRUP that a threatened release of petroleum had been identified. To protect against the known threatened release of petroleum, the CRUP prohibits Hamilton from "conduct[ing] activities which will disturb the soil at or below 5 feet below the current ground surface" throughout the Property, without prior approval from the Navy, RWQCB, and DTSC. *Id.* at 301. For the areas under Building 970, the prohibition applies to "the soil at or below 3 feet below the current ground surface." *Id.* at 302. These prohibitions are mirrored in the Deed. *See id.* at 279-80. These terms clearly identify the prior release or threatened release of petroleum on the Property, such that the petroleum contamination at issue cannot be qualified as "previously unidentified." Since there is no genuine issue of material fact regarding whether the petroleum contamination constitutes a "previously unidentified release or threatened release," Hamilton has not satisfied the threshold requirement to trigger the alleged remediation obligation by the Navy, and the Court need not address whether the Navy has an obligation under Sections II.L and II.K(5) of the Deed to remediate the petroleum contamination.[6]

---

[6] In response to a government interrogatory, Hamilton stated that it "is currently unaware of the date or details regarding any unidentified release of petroleum at the [] Property." [ECF 66-1] at 114. After briefing on the government's motion for summary judgment was complete, Hamilton filed a motion to amend this response, among others, by deleting this statement and inserting that "[i]nformation produced in discovery demonstrates that the majority of the petroleum contamination discovered by Hamilton at the [] Property was previously undiscovered because the petroleum contamination was larger, more expansive, and more severe than was disclosed in the Navy's FOST and other transaction documents." Pl.'s Mot. [ECF 84] at 16-17 (emphasis omitted). The government opposed Hamilton's motion. [ECF 85]. Although the Court has not yet ruled on Hamilton's request to amend its discovery responses, even if the Court were to grant the motion, the Court would still find that Hamilton has failed to produce

### D.    The Navy's Duty of Good Faith and Fair Dealing

The government argues that "Hamilton's implied breach of good faith and fair dealing claim . . . cannot stand" because "Hamilton seeks to expand the Navy's contractual duties beyond those in the Deed." [ECF 66] at 40. The government contends:

> Hamilton's breach claim is unsupported by the fundamental facts and law underlying the case because: (1) Hamilton never provided notice to the Navy of *any* alleged breach, (2) Hamilton *never* discovered any previously unidentified release of petroleum, (3) Chloroform was not stored, disposed of, or released at the [] Property prior to the date of transfer; (4) Hamilton has *not* produced any evidence that chloroform existed on the [] Property prior to transfer; and (5) as this Court has already ruled, Hamilton had no reasonable expectation that the Navy was required to ensure that the [] Property remained suitable for commercial use after the date of transfer . . . .

*Id.* at 38. According to the government, Hamilton's breach of the implied duty of good faith and fair dealing claim "is factually and legally unsupportable," and therefore, the Court should grant summary judgment in its favor. *Id.*

Hamilton argues that the government's assertions are inaccurate and that "the Navy has frustrated Hamilton's efforts to receive the fruit of the Deed by willfully ignoring Hamilton's notices, by failing to ensure a commercially useable property after notice of new contamination, and by disregarding evidence of new contamination." [ECF 67] at 32. According to Hamilton, its "reasonable expectation under the Deed was that the Navy would convey the Property in a condition suitable for commercial use, subject to the restrictions in the FOST and the [CRUP]," *id.* at 33, and that "Hamilton 'reasonably expected' the Navy to transfer a commercially developable property as part of the sale and ensure previously unidentified contamination was addressed," *id.* citing *Centex Corp. v. United States*, 395 F.3d 1283, 1305 (Fed. Cir. 2005)). Hamilton states that "[t]he Navy has failed to ensure that the Property is commercially suitable in response to new, previously unidentified contamination per the fruits of the Deed," *id.*, and that "Hamilton is not asking the Navy to maintain commercial uses *in perpetuity*; it is asking the Navy to help bring the Property to commercial standards when *new*, previously unidentified contamination is detected," *id.*

The Court agrees with the government that, based on the evidence, Hamilton's claim for breach of the implied duty of good faith and fair dealing is unsupported and that the government is entitled to judgment as a matter of law. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)). "The

---

any evidence showing that the petroleum contamination at issue constitutes a previously unidentified release or threatened release.

implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf*, 742 F.3d at 991. "Failure to fulfill that duty constitutes a breach of contract." *Id.* at 990. "[W]hile the implied duty exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on 'honoring the reasonable expectations created by the autonomous expressions of the contracting parties.'" *Id.* at 991 (quoting *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984)). Thus, "[t]he implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010) (citing *Centex Corp. v. United States*, 395 F.3d 1283, 1304-06 (Fed. Cir. 2005)). Further, while "a breach of the *implied* duty of good faith and fair dealing does not require a violation of an *express* provision in the contract," *Dobyns*, 915 F.3d at 739 (quoting *Metcalf*, 742 F.3d at 994) (internal quotation marks omitted), "a specific promise must be undermined for the implied duty to be violated," *Dobyns*, 915 F.3d at 739.

Here, Hamilton claims that the Navy breached the implied duty of good faith and fair dealing by failing to perform ongoing corrective action and remediation required by the Deed with respect to newly discovered chloroform and petroleum to ensure that the Property is suitable for commercial use. [ECF 67] at 33-34. However, this claim is either unnecessary given the express terms of the Deed or insufficiently tethered to such express terms. With respect to the chloroform, the Deed itself defines the Navy's remediation obligations in Section II.K(3). See [ECF 66-2] at 281. Therefore, the express terms of the Deed will settle the parties' rights regarding chloroform remediation, and "the duty of good faith and fair dealing [has] no role to play" in resolving this claim. *See BGT Holdings LLC v. United States*, 984 F.3d 1003, 1016-17 (Fed. Cir. 2020) (affirming dismissal of a claim for breach of good faith and fair dealing where the express terms of the contract provide the plaintiff a mechanism for obtaining relief).

With respect to the petroleum contamination, the express terms of the Deed in Section II.L and II.K(5) could be interpreted to obligate the Navy to remediate previously unidentified releases or threatened releases of petroleum. See [ECF 66-2] at 281-82. However, as discussed above, Hamilton did not produce any evidence that the petroleum at issue constitutes a previously unidentified release or threatened release. As such, Hamilton's claim based on the *express* terms of the Deed failed. Consequently, any obligation the Navy had to further remediate the existing petroleum contamination on the Property would need to be established based on the implied duty of good faith and fair dealing. Yet, there is no evidence that the Navy promised to perform additional remediation of the petroleum contamination that existed on the Property at the time of transfer. To the contrary, the Deed explicitly states that "the Property is conveyed 'as is' . . . without any representation, promise, agreement, or warranty on the part of the [Navy]," except as provided in the Deed or by law. [ECF 66-2] at 277. Without a sufficient tether to the terms of the Deed, the Court cannot use the implied duty of good faith and fair dealing to create an obligation on the part of the Navy to further remediate the existing petroleum contamination on the Property. *See Dobyns*, 915 F.3d at 740-41 (stating that "[i]nferring an implied duty . . . without a tether to the contract terms, would fundamentally alter the balance of risks and benefits associated with the [] agreement and cannot be the basis of a claim for breach of the implied duty

20

of good faith and fair dealing"). To create such an obligation would impermissibly expand the Navy's obligations beyond those bargained for in the Deed. *See Precision Pine & Timber Inc.*, 596 F.3d at 831 (finding that the government did not destroy the plaintiff's reasonable expectations under the contract because the parties did not contemplate the desired contractual benefit).

## V.    CONCLUSION

Accordingly, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion for summary judgment [ECF 66]. The Court **GRANTS** the motion with respect to Hamilton's breach of contract claim due to the Navy's alleged failure to remediate newly discovered petroleum contamination and breach of the implied duty of good faith and fair dealing claim and **DENIES** the motion with respect to Hamilton's breach of contract claim due to the Navy's alleged failure to remediate newly discovered chloroform.

Additionally, in connection with the government's motion for summary judgment, Hamilton filed a motion requesting that the Court take judicial notice of "the 2005 and 2019 [RWQCB] Environmental Screening Levels [("ESLs")]," [ECF 67-1] at 1, and a motion to amend and supplement its discovery responses, [ECF 84]. The Court **GRANTS** the motion for judicial notice because the RWQCB ESLs "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. of Evid. 201(b)(2); *see Mobility Workx, LLC v. Unified Pats.*, LLC, 15 F.4th 1146, 1151 (Fed. Cir. 2021) (taking judicial notice of published government documents). The Court **DENIES AS MOOT** Hamilton's request to amend its discovery responses, [ECF 84].

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge